**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| **MINDALE FARMS CO.,** | ) | Case No. _____ |
| 1245 Sand Run Road | ) | |
| Akron, OH 44313, | ) | |
| | ) | Judge _____ |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | |
| | ) | **DEMAND FOR JURY TRIAL** |
| **CITY OF TALLMADGE, OHIO,** | ) | **ENDORSED HEREON** |
| 46 North Avenue | ) | |
| Tallmadge, OH 44278, | ) | |
| | ) | |
| *Defendant.* | ) | |

## COMPLAINT

Plaintiff Mindale Farms Co. ("Mindale Farms"), for its Complaint against Defendant City of Tallmadge, Ohio ("Tallmadge" or "City") avers and alleges:

I.  **INTRODUCTION**

1.     Mindale Farms owns several large, undeveloped parcels of land within the City of Tallmadge, including approximately 124 acres of land on the north side of Northeast Avenue near the Howe Road / Munroe Road roundabout ("Property").  While the Property used to be a working farmstead in a bucolic rural area, the surrounding area has transformed over time into a collection of modern residential subdivisions.  Hallmarks of a successful farming operation, such as large tractors, massive combines, fertilizers, and smells emanating from various livestock, are no longer compatible with the surrounding residential subdivisions, suburban roads, and roundabouts.  Consequently, farming Mindale Farms' properties in Tallmadge is no longer practical or economically feasible.

2.     Recognizing this reality and the City's dire need for housing, the City amended its Zoning Code and Comprehensive Plan to encourage Mindale Farms to develop its large properties under the City's "R-6" zoning district ("R-6 District").  Under this zoning classification and the City's Comprehensive Plan, large swaths of Mindale Farms' land are to be improved with modern residential subdivisions, comprised of homes that are intentionally clustered together with relatively small yards that will maximize green space, preserve existing environmental features, and create other amenities for residents in the area.

3.     Mindale Farms therefore applied to rezone the Property to the R-6 District and for approval of a $90 million residential subdivision catered to the City's largest and most underserved market – the elderly and disabled (the "Development").

4.     The City's Planning and Zoning Commission ("Planning Commission") conducted a public hearing on the Development and unanimously recommended its approval.  Additionally, the City's Chief of Police, Chief of the Fire Department, and Economic Development/Planning Director reviewed the Development and did not have any health, safety, or welfare concerns.

5.     The Tallmadge City Council ("Council") and a vocal minority of "not-in-my-backyard" residents, however, arbitrarily opposed the Development.  For example, one resident erroneously argued to Council that residents in R-1 Districts – which are comprised of larger lots that are suited for young families – take better care of their homes.  Councilperson Kilway latched onto this discriminatory sentiment.  During Council's discussion of the Development's "***55 and up portion with the smaller lot size***," Councilperson Kilway concluded that she does not "***think that's Tallmadge***."  These unfounded and unsupported contentions were motivated by arbitrary disdain towards the Development and its future residents.  Even though the Development complied with the City's Zoning Code and Comprehensive Plan in every respect, and only advanced the

- 2 -

health, safety, and welfare of the City, Council arbitrarily rejected it.

6.     Council then turned its focus to eliminating the R-6 District altogether through Ordinance 2022-45.   During a subsequent hearing on Ordinance 2022-45, Mindale Farms reminded Council that the purpose of the R-6 District was and always has been to "broaden residential zoning for *all demographics*."   Others informed the Council that the repeal of the R-6 District would "*eliminat[e] opportunities for affordability and diversification of housing choices*" in the City.   Nevertheless, Council unanimously repealed Ordinance 2022-45.

7.     The City's arbitrary conduct is an outrageous abuse of power and an affront to Mindale Farms' private property rights and the civil rights of current and potential residents of the City.   Mindale Farms simply seeks to build the Development consistent with the Zoning Code at the time of their application and the City's Comprehensive Plan.   Mindale Farms' right to do so is "inviolate."   *See* OHIO CONSTITUTION Art. I, Sec. 19.   Yet, the City has arbitrarily and capriciously singled Mindale Farms out, deprived it of any legitimate process and subjugated Mindale Farms' private property rights to the unfettered discretion of City officials' arbitrary whims and fancies. Moreover, City officials allowed stereotypical views of seniors to overtake their decision-making, which disproportionately impacts disabled persons in direct violation of federal civil rights law.

8.     For these reasons and those set forth below, Mindale Farms seeks injunctive, monetary, and declaratory relief for the City's egregious violations of the United States and Ohio Constitutions, Ohio zoning law, the Fair Housing Act of 1968 (the "FHA"), and the Americans with Disabilities Act of 1990 (the "ADA").

**II.     PARTIES**

9.     Plaintiff Mindale Farms Co. ("Mindale Farms") is an Ohio company with a principal place of business in Akron, Ohio.   Mindale Farms owns several large properties within the City of Tallmadge, including:

| Summit County Permanent Parcel No. | Approx. Size |
|---|---|
| 60-08558 (the Property) | 124.94 Acres |
| 60-00817 | 125.09 Acres |
| 60-08557 | 270.84 Acres |
| 60-09592, 60-08555, 60-08556, 59-00007[1] | 111.24 Acres |

10.     Defendant the City of Tallmadge, Ohio is a chartered municipal corporation located in Summit County, Ohio and subject to the laws of the State of Ohio.

11.     In addition to the foregoing parties, the Attorney General of the State of Ohio is being served with a copy of this Complaint pursuant to Ohio Revised Code § 2721.12(A).

III.    JURISDICTION AND VENUE

12.     This action arises under the Constitution and laws of the United States, including 42 U.S.C. § 1983.

13.     Jurisdiction is conferred on this Court pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1343(a)(3), and 28 U.S.C. § 2201.  Jurisdiction supporting Mindale Farms' supplemental Ohio Constitutional claims is conferred by 28 U.S.C. § 1367.  Jurisdiction supporting Mindale Farms' claims for attorneys' fees is conferred by 42 U.S.C. § 1988.

14.     Venue in this Court is proper under 28 U.S.C. § 1391(b)(2) as this is the judicial district in which a substantial part of the events or omissions giving rise to the claim occurred.

---

[1] Summit County permanent parcel numbers 60-09592, 60-08555, 60-08556, 59-00007 are adjacent properties and are, collectively, approximately 111.24 acres in size.  Permanent parcel 59-00007 is situated in Munroe Falls, Ohio.

**IV.**     **FACTS COMMON TO ALL CLAIMS**

**A.**     **The City Calls for the Property and Other Large Properties to Be Developed as Residential Subdivisions Under the R-6 District.**

15.     Historically, residential zoning in the City primarily consisted of two antiquated zoning districts – the R-1 and R-2 Districts – both of which require minimum 20,000 square-foot lots.  Because the R-1 and R-2 Districts require large lot sizes, fewer homes were built in these zoning districts.  This lowered the supply of housing, resulting in a housing shortage.

16.     In 2011, the City adopted the Residential Open Space Planned Development District, also known as the R-6 District, as a solution for the City's growth and development.  The R-6 District permits development on smaller 7,280 square-foot lots.  The R-6 District enables the City to increase its stock of single-family homes while preserving open space and sensitive environmental areas.

17.     The R-6 District only applies to blocks of land that are 100 acres or greater in size.  Pursuant to the City Zoning Code, the R-6 District provides "an opportunity for creative and flexible arrangement and mix of single-family-homes that is not permitted within the standard municipal zoning district classifications."

18.     The City amended its Comprehensive Plan in November 2017.  According to the City, the amended Comprehensive Plan "[g]uides private land owners in making individual plans for the development of their property;" "[p]rovides direction for the review and strengthening of the various land development controls;" "[d]efines a unified set of objectives for the development of the community;" and "[d]etermines community objectives which effectuate a sound pattern of development."  According to the City, its Comprehensive Plan "outlines the pattern toward which the community should logically develop" upon "taking into consideration the health, safety, economic viability and welfare of the community."

19.     The Comprehensive Plan calls for the development of residential subdivisions on the few remaining large tracts of undeveloped land in the City under the City's R-6 District.

**B.      Consistent with the Zoning Code and the Comprehensive Plan, the City Rezones Other Large Properties to the R-6 District.**

20.     Pursuant to its Comprehensive Plan, the City rezoned other large properties to the R-6 District to permit residential subdivisions.

21.     In 2017, the City began its process of rezoning the 103.7401-acre property formerly known as Ripley Farm.

22.     Similar to the Property, Ripley Farm was a centuries old farm with an abandoned farmhouse.  However, the community surrounding Ripley Farm had grown such that there are many residential homes near it, making economic farming operations no longer viable.

23.     On December 14, 2017, Council, via Ordinance 82-2017, approved the rezoning of Ripley Farm to an R-6 District in order to construct a planned 208 parcel single-family housing development now known as Tallmadge Reserve.  Tallmadge Reserve was intended to have a range of lot sizes and would include 30 acres of open space.

**C.      The City Encourages Mindale Farms to Rezone the Property to the R-6 District.**

24.     The City's Comprehensive Plan divides the City into different areas.  The Property is located in the City's Focus Area 5: Eastern Border ("Area 5") and is outlined in black below:



25.     The Comprehensive Plan calls for Mindale Farms to develop its large tracts of vacant land located Area 5 as an "R-6 Planned Development District."

26.     Pursuant to the Comprehensive Plan, one of the key zoning policies for property located in Area 5 is to "[e]ncourage owners of large tracts of vacant land to consider the application of the R-6 Planned Development District which offers flexibility in responding to the residential market and helps preserve large open space and environmentally sensitive areas."

27.     Mindale Farms is the **only** private property owner that owns undeveloped private property in Area 5 large enough to satisfy the R-6 District development requirements.

28.     In fact, Mindale Farms is the only private property owner that owns undeveloped land in the City large enough to satisfy the R-6 District development requirements.

**D.     Mindale Farms Cannot Develop the Property Under Its Current Zoning Classification.**

29.     The Property is largely undeveloped, populated with only a 113-year old farmhouse, an almost 60-year old cattle barn, and about a dozen cattle.

30.     The Property is currently zoned in the R-1 District zoning classification, which permits farming operations and single-family residential homes so long as each home is situated on a large lot that is at least 20,000 square feet in size.

31.     Due to the City's growth and development, farming the Property is no longer practical or economically feasible.  Among other reasons, the Property's proximity to residential homes, suburban streets, and a nearby roundabout prevents the reasonable use of fertilizers, large farming equipment, and other farming activities necessary for maintaining livestock and crops.

32.     The Property also has several inherent challenges to its use and development.

33.     First, the Property has rolling hills and is bisected by large gas transmission pipelines, sanitary pipelines, gas wells, and large power lines.   In order to develop the Property,

one must develop *around* these fixed constraints with a development of sufficient size to pay for the infrastructure necessary to do so.  The existing R-1 zoning classification makes this task impossible for the Property because it does not permit a unified development.

34.     Second, without consolidated development, installation of a centralized sanitary sewer system would be cost prohibitive were the Property to be developed as R-1 District, resulting in homes being served by individual septic systems.  However, the Property's existing topography and wetlands already suffer from surface water issues that would not be amenable to septic systems.

35.     Third, the Property's existing topography includes wetlands and riparian areas that cannot be preserved under the R-1 District restrictions:



Developing the Property in the R-1 District would not afford protections to wetlands and riparian areas because the R-1 District, with its large lots, does not permit the clustering of homes.  In an R-6 District, however, the wetlands can be preserved and managed as a neighborhood amenity. Whereas under the R-1 classification, such neighborhood clustering is not permitted and the

wetlands and riparian areas are left as unmanaged and unused vacant land.

36.     Fourth, the wetlands and riparian areas present a flooding issue that cannot be alleviated through development of large residential lots that the R-1 District requires. Consequently, housing developed under the R-1 classification would need to be clustered around wetlands and riparian areas of the Property and would require extensive and prohibitively expensive water management and grading.

37.     The Property cannot be economically developed with single-family homes on arbitrarily large lots because of such challenges.  Among other reasons, a certain density of homes is necessary to reasonably defray the infrastructure costs necessary to support residential homes on the Property while also accounting for the Property's inherent development challenges.

38.     In other words, the Property remains largely undeveloped land for these reasons and cannot be feasibly developed under the City's R-1 zoning restrictions.  Pursuant to the City's Comprehensive Plan, development of the Property requires its rezoning and development as an R-6 District.

**E.      Mindale Farms and Pulte Plan a Development that will Serve Seniors.**

39.     Pulte, as a national expert in residential development, evaluated the market and concluded that the City lacked sufficient housing for elderly residents.  The City's population is disproportionately older in age.  Over 34% of the population is over 55 years of age compared to a national average of about 28.3%.

40.     Together, Mindale Farms and Pulte concluded that a development  that will attract senior citizens would be ideal for the Property.  They determined that the ideal home for a senior resident is smaller with living space concentrated on the first floor, maintenance free – e.g., lawn care, snow removal, and other maintenance is taken care of – and provides more things to do in the neighborhood

41.     The R-6 District allows Mindale Farms and Pulte to develop this residential subdivision on the Property because the R-6 District does not require the expensive, larger lot sizes required by an R-1 District.

**F.      Mindale Farms and Pulte Submit an Application to Rezone the Property with a Development Plan.**

42.     On December 17, 2021, Mindale Farms and Pulte filed with the City an application for Amendment to the Zoning Map with a Development Plan (the "Application").

43.     The Application was resubmitted on February 11, 2022 with minor modifications.

44.     The Application prescribes that 124.1631 acres – or about 5,408.410 square feet – of the Property would be rezoned from an R-1 District to an R-6 District to develop a majority homes on small lots, which would include the Development.



45.     Rezoning is necessary for the Development to mix different styles and types of single-family homes, which are not permitted in the R-1 District.

46.     The majority of the Development will serve senior citizens, aged 55 and over, who are seeking to downsize to one floor, smaller ranch homes.

47.     All exterior maintenance will be provided by a homeowners' association, which will enable the Development's elder population to live comfortably and safely.

48.     Under the R-6 District zoning classification, the Development would include 232 homes.

49.     Under the Zoning Code, a minimum of 20% of the Development must be consistent with the R-1 District zoning classification.  The Development complied with this standard because 27.4569 acres of the Development would be developed with lots greater than 20,000 square feet as the R-1 District requires.  The minimum requirement is 24.8326 acres.  This results in 85 lots out of the 232 with more than 20,000 square feet.

50.     The remaining 147 lots are in direct compliance with the R-6 District zoning requirements.  Importantly, the development of these additional lots, consisting of the vast majority of the Development, defrays the substantial infrastructure costs necessary for the entire Development, including the 85-larger lots.

51.     Under § 1103.06(C) of the Zoning Code, an R-6 District may have six (6) units on any single acre – or about one unit per 7,280 square feet.

52.     This aspect is integral to the Development's mission to provide affordable homes for senior citizens because lot size is directly correlated with both cost and probable customer.

53.     In short, the R-1 District is not an economically viable option for the Property because the lot sizes are too big and the homes would be too expensive.

54.     The R-6 District also requires more open space than an R-1 District.  The R-6 District requires 30% open space versus only 5% for an R-1 District.

55.     For example, the Development includes 45.7545 acres of open space and access to two trailheads to Summit Metroparks Freedom Trail.

- 11 -

56.     Furthermore, the R-6 District gives the City more control over the design, look, and "feel" of a development than the R-1 District and preserves sensitive environmental features and natural characteristics on the site that would be lost if developed as an R-1 District.

57.     The Development would also be a boon for the City's finances, expecting to generate about two-million dollars ($2,000,000.00) of revenue a year in property taxes.

58.     These property taxes would be mostly paid by "empty nesters" without children that matriculate in the City's schools.

59.     Accordingly, developing the Property as an R-6 District consistent with the Application would be a win-win for all stakeholders.  The City's largest constituency would be serviced with affordable homes, nature would be preserved, and the tax-base would increase without burdening the schools.

**G.      On February 22, 2022, the Planning Commission Unanimously Recommends Approval of the Application to Council.**

60.     On February 22, 2022, the Planning Commission held a hearing on the Application.

61.     At the hearing, residents voiced unsubstantiated concerns about the Development and discriminatory views of the Development's potential residents.  All of these allegations were unfounded and not supported by evidence.  Rather, the allegations were motivated by disdain towards the Development.

62.     Before voting, Commissioner Oliver declared her favorability for the Development because it provided "distinct advantages . . . [to] the [C]ity as a whole."

63.     The other Commissioners agreed and found that the Application was consistent with all applicable criteria in the Zoning Code while unanimously approving the Application (5-0).

**H.    Mindale Farms Is Denied Any Meaningful Consideration of the Application at the Council Meeting and Council Denies the Application.**

64.    On March 10, 2022, Council held a hearing on the Application, which was assigned the title Ordinance 2022-29.

65.    Similar to the Planning Commission hearing, many residents voiced their displeasure with the Development and expressed stereotypical notions about senior housing and senior citizens, including unfounded speculation that senior housing lowers property values and drains community services.

66.    The Zoning Code mandates that Council shall, at a minimum, consider the reports and opinions transmitted by the Zoning Administrator, the recommendation from Planning Commission, and the review criteria of this section.

67.    Although the Comprehensive Plan, professional zoning and development staff, and Planning Commission were all unanimous in finding that the Application met every applicable requirement, Council arbitrarily followed a vocal minority of stereotypical views to the contrary.

68.    For example, Councilperson Kilway stated that the "55 and up portion with the smaller lot size," or the section of the Development for older persons, is "just too close" together without a larger yard, and that she does not "think that's Tallmadge."

69.    Councilperson Bozic stated that while the open space of the Development is attractive, the "housing side of it is what makes it unattractive."  He "want[ed] to see houses that have wider frontages," rather than the proposed smaller lots.

70.    Council arbitrarily denied the Application without any legitimate basis to do so.

71.    Before rejecting the Application, Council President Loughry stated that Council will look to issue a moratorium on R-6 Districts as soon as possible.

I. **The Planning Commission Votes to Keep the R-6 District and Voices Concern about Council's Actions.**

72.     After the denial of the Application, the City turned its focus to the elimination of the R-6 District.

73.     On May 5, 2022, the Planning Commission held a hearing for Ordinance 2022-45, which was proposed by Council and City Administration to repeal the R-6 District.

74.     Jim O'Connor, Director of Entitlement and Planning at Pulte, presented against the elimination of the R-6 District.  Mr. O'Connor expressed his surprise at the lack of empirical research or fact-based reasoning underlying Council's rejection of the Application.

75.     Likewise, Mr. O'Connor questioned what information upon which the City was basing its repeal of the R-6 District.  Mr. O'Connor stated, "the repeal of R-6 continues to aid and compound [the lack of available and affordable housing] by driving hous[ing] costs up and diminishing availability of affordably priced new construction."

76.     Mr. O'Connor also stated that the City presented no evidence that it will "be able to cater to the largest buying segment of the population," because "over 34% of the population in Tallmadge is over 55," and the repeal of the R-6 District will take "housing and new housing pricing and put[] it at a [price] point" where it is unaffordable.

77.     In other words, Mr. O'Connor put the City on notice that the repeal of the R-6 District would have a disproportionate impact on seniors.

78.     Commissioners also expressed their surprise at Council's animosity towards the Application, the Development, and the R-6 District.

79.     For example, Commissioner Larson stated that the Planning Commission "followed the code to the letter," when approving the Application and "we were betrayed" by Council.

80.     Commissioner Oliver stated that the Planning Commission was "kind of blindsided

- 14 -

by the Council . . . ."

81.     Commissioner Heilmeier stated that the Planning Commission was "put out to dry" by Council.

82.     The Planning Commission voted to deny Ordinance 2022-45.  The Planning Commission recommended that the R-6 District remain on the books.

**J.      Council Eliminates the R-6 District, Ignoring Warnings about the Impact on the Housing Market.**

83.     On May 12, 2022, Council held a hearing on Ordinance 2022-45.  Even though the R-6 District applied only to properties owned by Mindale Farms, no notice was provided to Mindale Farms.

84.     At the hearing, Mr. O'Connor again cautioned against repealing the R-6 District.  Mr. O'Connor noted that the repeal of the R-6 District would "eliminate[e] opportunities for affordability and diversification of housing choices."   Moreover, out of the "thousands of permanent parcels within the City of Tallmadge, [t]here's approximately thirty parcels . . . that are greater than twenty acres.  Of which only *five* would qualify under R-6."

85.     Ms. Trina Carter, President of Mindale Farms, also spoke at the hearing urging Council to follow Planning Commission's recommendation against repealing the R-6 District.  Despite representing the only landowner that owns private property directly affected by Ordinance 2022-45, Ms. Carter was arbitrarily limited to two minutes and prevented from providing her complete testimony.  In the time she was given, Ms. Carter described how the City deliberately sought input from all residents when enacting the R-6 District zoning classification in 2011, as well as when the R-6 District was amended in 2021.  As such, repealing the R-6 District less than a year after amending is unreasonable and makes little sense.  Ms. Carter also reminded the Council that the purpose of the R-6 District was and always has been to "broaden residential zoning for *all*

*demographics*."

86.     Despite these warnings, Council unanimously voted in favor of Ordinance 2022-45, repealing the R-6 District from the Zoning Code.

87.     Council repealed the R-6 District to prevent Mindale Farms from developing its remaining properties under the R-6 District.

> **K.      The Repeal of the R-6 District Has a Disproportionate Impact on Persons with Disabilities or Handicaps.**

88.     In exchange for state and federal funding, the City certified that it would conduct its activities in accordance with state and federal civil rights provisions related to furthering fair housing.  To provide fair housing – including housing for disabled residents – the City must provide affordable housing for its older residents.

89.     Disabled persons are disproportionately impacted by the lack of affordable housing for older persons.  There is a real need for affordable housing for persons 55 and over in the City, where over 34% of its resident are 55 or older.

90.     The Ohio Housing Needs Assessment Report by the Ohio Housing Finance Agency notes that "[t]he prevalence of disability in Ohio has been generally increasing since 2008 and has consistently been above the national average."

91.     Further, "the disability rate is substantially higher for aging adults older than 65."

92.     According to the Centers for Disease Control and Prevention (the "CDC"), about 40% of all adults age 65 years and older have a disability.

93.     The repeal of the R-6 District makes it economically infeasible for developers to build single-family residential properties suitable for disabled persons.  Therefore, by eliminating the R-6 District, the City is reducing housing stock suitable for disabled persons and increasing the cost of the remaining housing.

- 16 -

94.    For example, the cost to build the Development under the R-6 District zoning classification costs about $94,575 per unit, while the cost for similar Development under the R-1 District restrictions costs $155,752 per unit.  This equates to about a ***165% increase in cost*** and renders development under the R-1 District economically infeasible.

95.    The U.S. Department of Justice and the Department of Housing and Urban Development previously instructed municipalities that this precise land use scheme – to require arbitrarily large lot sizes – violates the Fair Housing Act:

> Examples of land use practices that **violate the Fair Housing Act** under a discriminatory effects standard include minimum floor space or **lot size requirements that increase the size and cost of housing** if such an increase has the effect of excluding persons from a locality or neighborhood because of their membership in a protected class, without a legally sufficient justification.

*Joint Statement of the Dept. of Housing and Urban Dev. and the Dept. of Justice: State and Local Land Use Laws and Practices and the Application of the Fair Housing Act*, Nov. 10, 2016, at p. 5.

96.    Therefore, the City's denial of the Application and repeal of the R-6 District has created an environment where it is impossible to build affordable housing for the City's older residents.  Disabled persons make up a disproportionate share of older residents and are therefore disparately impacted by the elimination of the R-6 District.

## V.    CLAIMS FOR RELIEF

### COUNT I – Violation of Equal Protection
### Under 42 U.S.C. Section 1983 and the Ohio Constitution

97.    Mindale Farms restates the foregoing paragraphs as if fully rewritten herein.

98.    Mindale Farms has been subjected to unequal treatment of the law in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

99.    The City has rezoned similarly situated properties from residential districts to the R-6 District, including but not limited to Ripley Farm.

100.  Mindale Farms' Application complied with all of the legitimate zoning standards set by the City.  Yet, Council arbitrarily and unreasonably denied the Application.

101.  Mindale Farms has been deprived of property and liberty interests by discriminatory treatment in comparison with other similarly situated persons.

102.  The City has no rational basis for the discriminatory treatment of Mindale Farms.

103.  The City denied the Application with discriminatory intent because the Development would house elderly residents.

104.  The City's discrimination based on the age of the Development's residents is not rationally related to any legitimate interest.

105.  Accordingly, Mindale Farms has suffered and will continue to suffer from the City's unequal treatment of the law.

### COUNT II – Regulatory Taking without Just Compensation
### Under 42 U.S.C. Section 1983 and the Ohio Constitution

106.  Mindale Farms restates the foregoing paragraphs as if fully rewritten here.

107.  The City's failure to remove the R-1 zoning classification in favor of the R-6 zoning classification interferes with Mindale Farms' investment-backed expectations and results in severe detrimental economic impacts to Mindale Farms.

108.  The City's imposition of the R-1 zoning classification as applied to Mindale Farms' properties, including the Property, is functionally equivalent to a direct appropriation of the Property and therefore constitutes a regulatory taking.

109.  The City has not provided Mindale Farms with just compensation for its Property.

110.  Accordingly, Mindale Farms has suffered and will continue to suffer the taking of its Property without just compensation in violation of the Fifth Amendment the United States Constitution.

**COUNT III – Retaliation**
**Under 42 U.S.C. Section 1983 and the Ohio Constitution**

111.    Mindale Farms restates the foregoing paragraphs as if fully rewritten herein.

112.    Mindale Farms has been engaging in activity protected by the First Amendment of the United States Constitution and Ohio Constitution by exercising its right to apply to the City for land use approvals, including by filing the Application.  Mindale Farms' activity constitutes petitioning activity under the United States Constitution and the Ohio Constitution

113.    Mindale Farms' exercise of its First Amendment rights angered City officials.

114.    The City, in retaliation for Mindale Farms' exercise of its First Amendment rights, has continuously and systematically fought Mindale Farms' efforts to develop its Property and other properties contrary to Ohio law, the Ohio Constitution, and the United States Constitution for the purpose of grinding down and gradually destroying Mindale Farms' will to exercise its First Amendment rights.

115.    The City's retaliatory actions against Mindale Farms would, in their totality, chill or deter an ordinary person from exercising one's First Amendment right to petition to the City for a land use approval concerning the Property's development or for approval of the Application.

116.    Mindale Farms' First Amendment activity was a motivating factor for the City's retaliatory actions, as indicated by the City's unequal, inequitable, arbitrary and unreasonable treatment of Mindale Farms and the City's ongoing campaign of adverse actions against Mindale Farms.

117.    The totality of the City's retaliatory acts violate Mindale Farms' First and Fourteenth Amendment rights under the United States Constitution and Ohio Constitution.

118.    As a result, Mindale Farms has suffered and will continue to suffer the violation of its rights under the United States and Ohio Constitutions

- 19 -

119.    The City's actions are ongoing and Mindale Farms needs declaratory and injunctive relief to stop the retaliation.

### COUNT IV – Violation of the Fair Housing Act of 1968 and the Americans with Disabilities Act of 1990

120.    Mindale Farms restates the foregoing paragraphs as if fully rewritten herein.

121.    The City is subject to the FHA.

122.    The City is also subject to the ADA.

123.    Both the FHA and the ADA prohibit discrimination against persons with a disability or a handicap in the terms, privileges, or conditions of the sale or rental of a dwelling, and in the provision of services of facilities in connection therewith.  The FHA and ADA also prohibit enactment of facially neutral ordinances or policies that have a disparate impact on persons with a disability or handicap.

124.    While the decision to repeal the R-6 District and the denial of the Application may appear facially neutral, the City's decision to repeal the R-6 District and deny the Application both have a disproportionate impact on persons with disabilities or a handicap:

    a.    There is a shortage of housing in the City.

    b.    Persons older than 55 make up over 34% of residents in the City;

    c.    The City is rapidly aging;

    d.    Persons over 55 make up a disproportionate share of households in the City and are the largest buying segment;

    e.    The Development is primarily designed to serve the significant senior population with disabilities who cannot maintain the exterior of the Property;

    f.    Seniors make up a disproportionate share of persons with disabilities who rely on housing that requires minimal maintenance;

g. The only portion of the Development that did not comply with R-1 District requirements is the "empty nester" housing marketed to individuals over 55;

h. The repeal of the R-6 District makes it economically infeasible to develop housing for persons over 55 in the City;

i. The repeal of the R-6 District and denial of the Application drastically reduces the development of housing for persons over 55 in the City, such that there is a lack of such housing in the City.

j. The lack of housing for persons over 55 in the City has a disproportionate effect on persons with disabilities or handicaps.

125. The City's repeal of the R-6 District and denial of the Application does not further a legitimate bona fide governmental interest. Alternative courses of action, yielding lesser discriminatory impacts, are available to the City.

126. Moreover, the repeal of the R-6 District is facially discriminatory against persons with disabilities in the sale or accessibility of housing in the City.

127. The City offered no evidence on how the repeal of the R-6 District would allow the City to cater to the senior housing demographic, or, in the alternative, fulfill the ongoing need for housing serving seniors in the City.

128. The imposition of requirements that make it more difficult for the disabled to live where they choose is discriminatory. And the City's repeal of the R-6 District makes it harder for disabled residents to live in the residential neighborhood of their choice.

129. The City's decision to repeal the R-6 District and deny the Application amounts to discrimination of persons with disabilities in the sale or availability of housing in the City.

130. Because repeal of the R-6 District and denial of the Application both violate the

FHA and the ADA, Mindale Farms is entitled to an injunction to prohibit the City from repealing the R-6 District, compensatory damages, and attorneys' fees and costs.

## COUNT V – Declaratory Judgment

131.    Mindale Farms restates the foregoing paragraphs as if fully rewritten herein.

132.    The R-1 zoning designation as applied to the Property is unconstitutional, unreasonable, and/or not substantially related to the public health, safety, morals, or general welfare, or the circumstances of the case.

133.    Imposing the current zoning restrictions on the Property is arbitrary, capricious, and unreasonable, and prevents Mindale Farms from putting its property to legitimate and economical uses consistent with the City's Zoning Code at the time Mindale Farms filed its Application.

134.    Therefore, Mindale Farms is entitled to a declaration that subjecting the Property to an R-1 zoning designation is unconstitutional, unreasonable, and/or not substantially related to the public health, safety, morals, or general welfare.

135.    The rezoning of the Property to R-6 District as set forth in the Application and the City's Comprehensive Plan is constitutional, reasonable, and substantially related to the public health, safety, morals, or general welfare.

136.    Therefore, Mindale Farms is entitled to a declaration that rezoning the Property to R-6 and approving of the Application is constitutional, reasonable, and substantially related to the public health, safety, morals, or general welfare.

## VI.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff Mindale Farms Co. seeks:

   A.  Compensatory damages in an amount to be determined by a jury;

   B.  A declaration that Ordinance 2022-45 is unconstitutional;

   C.  A declaration that subjecting the Property to an R-1 District zoning designation

is unconstitutional, unreasonable, and/or not substantially related to the public health, safety, or welfare;

D. A declaration that the City's denial of Mindale Farms' Application was unconstitutional and unlawful;

E. A declaration that subjecting the Property to the R-1 District zoning classification is unconstitutional, unreasonable, not substantially related to the public health, safety, or welfare;

F. A declaration that rezoning the Property to the R-6 District and approving the Application is constitutional, reasonable, and substantially related to the public health, safety, and welfare;

G. An injunction requiring the City to refrain from any action to prevent Mindale Farms from developing the Property consistent with the Application;

H. Pre- and post-judgment interest;

I. Attorneys' fees and costs pursuant to 42 U.S.C. § 1988; and

J. Any other declarative, injunctive, or other equitable relief this Court deems just and appropriate.

Respectfully submitted,

VORYS, SATER, SEYMOUR AND PEASE LLP

*/s/ Joseph R. Miller*
Joseph R. Miller (0068463)
Christopher L. Ingram (0086325)
Elizabeth S. Alexander (0096401)
52 East Gay Street, P.O. Box 1008
Columbus, OH 43216-1008
(614) 464-6400 / Fax: (614) 719-4954
E-mail:  jrmiller@vorys.com
        clingram@vorys.com
        esalexander@vorys.com

*Attorneys for Plaintiff Mindale Farms Co.*

## **DEMAND FOR TRIAL BY JURY**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff Mindale Farms Co. demands a trial by jury on all issues so triable.

*/s/ Joseph R. Miller*
Joseph R. Miller (0068463)