UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| MINDALE FARMS CO., | ) | CASE NO.  5:23-cv-00424 |
| | ) | |
| Plaintiff, | ) | JUDGE BRIDGET MEEHAN BRENNAN |
| | ) | |
| v. | ) | |
| | ) | |
| CITY OF TALLMADGE, OHIO, | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| Defendant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| VINCENT PUTATURO, *et al.*, | ) | |
| | ) | |
| Intervenors. | ) | |

Before the Court are cross-motions for summary judgment filed by Plaintiff Mindale Farms Co. ("Mindale Farms") and Defendant the City of Tallmadge, Ohio ("Tallmadge"). (Docs. 67, 68.)  For Mindale Farms, it is a partial motion for summary judgment.  (Doc. 67.) Tallmadge moved for summary judgment in full.  (Doc. 68.)  Both parties opposed the others' motion (Docs. 75, 76) and both replied (Docs. 78, 81).  Intervenors[1] joined Tallmadge's motion. (Doc. 77.)  For the reasons stated herein, Mindale Farms' partial motion for summary judgment is DENIED, and Tallmadge's motion for summary judgment is GRANTED.  Tallmadge's Second Motion for Judgment on the Pleadings (Doc. 61) is DENIED as moot.  Mindale Farms' Motion for Leave to Seal (Doc. 65) is GRANTED.

---

[1] The Intervenors are Vincent Putaturo, William Conley, Donna Conley, Bill Clark, Sonja Clark, and Gary Villers.

I.      **BACKGROUND**

A.      **Undisputed Facts**

After World War II, Van Dale Carter purchased several tracts of land in Tallmadge.  (Doc. 50 at 1718, ¶ 32.)[2]  In 1999, Trina Carter, Van Dale Carter's granddaughter, purchased the tracts of land through Mindale Farms.  (*Id.*)  Carter is the principal of Mindale Farms.  (*Id.*)  Currently, Mindale Farms owns several parcels of land in Tallmadge.  (Doc. 67-1 at 2310, ¶ 4.)  This dispute involves Parcel No. 60-08558, approximately 125-acres with a century-old farmhouse and a half-century old barn ("the Property").  (*Id.* at ¶ 3.)  The Property was historically, and still is, utilized as a working farmstead.  (*Id.* at ¶ 5.)  Much like many small farming towns in America, urban sprawl came to Tallmadge.  (Doc. 67 at 2289.)  To Mindale Farms, this, along with other economic factors, made farming operations on the Property no longer financially viable.  (Doc. 67-1 at 2311, ¶ 6.)  But what to do with the Property?  Enter Pulte Homes of Ohio, LLC ("Pulte").

Pulte is a residential home development planner and construction company.  (Doc. 50 at 1721, ¶ 43.)  In May 2021, Pulte partnered with Mindale Farms to develop the Property into a residential subdivision.  (Doc. 67-4 at 2426, ¶ 11.)  But Mindale Farms and Pulte faced a problem: the Property was currently zoned as R-1, a zoning district which permitted agricultural uses and single-family homes with lot sizes of at least 20,000 square feet and frontages at least 100 feet wide.  (Doc. 67-2 at 2333.)  Pulte and Mindale Farms believed this designation economically prohibited any home development, mainly because large lot sizes and increased costs which would result in over-priced and unmarketable homes.  (Doc. 67-4 at 2425, ¶ 7.)  To

---

[2] For ease and consistency, record citations are to the electronically stamped CM/ECF document and PageID# rather than any internal pagination.

solve this issue, Pulte planned to apply to have the Property rezoned as an R-6 zoning district.
(*Id.* at ¶¶ 8-9.)

Before addressing the rezoning application and the crux of this dispute, a brief background of Tallmadge's zoning laws is helpful.  Prior to 2011, Tallmadge had two residential zoning districts, R-1 and R-2.  (Doc. 50 at 1715, ¶ 15.)  Both required large lot sizes.  (Doc. 67-2 at 2396.)  In 2011, Tallmadge added the R-6 zoning district.  (*Id.*)  The R-6 district was "an alternative zoning tool to be considered for large vacant land areas" with the "primary purposes" to "provide for the flexible arrangement and mix of single family opportunities and help preserve open space and sensitive natural areas."  (*Id.*)  R-6 zoning districts allow for the construction of residential subdivisions in project areas at least 100 acres large and allows for single family homes on smaller lots with increased clustered development.  (*Id.* at 2334.)  Essentially, as Tallmadge grew more populous, more homes were necessary.  But Tallmadge wanted to "preserve sensitive environmental features, agricultural and farmlands" and "[p]romote development that respects the unique characteristics, natural quality and beauty, and rural characteristics of the site and the immediate vicinity."  (*Id.*)  Below is an example R-1 district (on the left) versus an R-6 district (on the right):



(*Id.* at 2359.)

In 2017, Tallmadge updated its Comprehensive Plan, which had been in place since 1997.  (*Id.* at 2374.)  Tallmadge reaffirmed its desire to attract large landowners to convert parcels into

R-6 districts.  (*Id.* at 2396.)  Specifically, in Focus Area 5, Tallmadge wanted to "[e]ncourage owners of large tracts of vacant land to consider the application of the R-6 Planned Development District."  (*Id.* at 2396-97.)

Rezoning properties in Tallmadge requires an application.  The application is reviewed by various city departments.  (Doc. 76 at 2623.)  Once an application is received, it is distributed to departments including engineering, the police, and utilities and services.  (*Id.*)  These departments assess the application and provide summaries to Tallmadge's Planning and Zoning Commission (the "Commission").  (*Id.*)  The Commission reviews the application, the summaries of Tallmadge's various departments, and assesses whether the rezoning application complies with the zoning laws and goals of Tallmadge.  (*Id.*)  The Commission then makes a recommendation to the City Council.  (*Id.*)  Only City Council can approve or deny an application.  (*Id.*)

In August 2017, McKinley Development Company applied to rezone a parcel of land owned by Ripley Farm to an R-6 district.  (Doc. 76-4 at 2878.)  At the time, Ripley Farm was a 100-acre parcel in northeast Tallmadge, specifically Focus Area 5.  (*Id.*)  Prior to 2017, it was an R-2 district.  (*Id.*)  The land itself had long been vacant.  (Doc. 68 at 2485.)  It was utilized as farmland but had been abandoned for many years.  (*Id.*)  In the application to rezone and develop Ripley Farm, McKinley planned to create a residential subdivision called "Tallmadge Reserve."  (*Id.* at 2484-85.)  Tallmadge Reserve was to accommodate 208 single-family homes.  (*Id.*; Doc. 50 at 1717, ¶ 25.)  Though some traffic concerns were noted, the Commission recommended approving the application.  (Doc. 76 at 2624.)  In December 2017, City Council approved the application without much public input.  (*Id.*)  After approval, Pulte purchased the property.  (Doc. 68 at 2484.)  Construction began shortly thereafter.  (*Id.* at 2484-85.)

Back to the instant dispute.  On December 17, 2021, Pulte and Mindale Farms requested the Property be rezoned from an R-1 district to an R-6 district (the "Pulte Application").  (Doc. 58-3 at 1891.)  The application proposed 236 residential homes.  (*Id.* at 1891.)  The Property is a 125-acre parcel currently used for farming.  (Doc. 67-3 at 2408.)  The Property has two significant streams and approximately 6.5 acres of wetlands.  (*Id.*)  Though the parties dispute some of the specific characteristics of the Property, the record reflects that while the Property is level in some areas (Doc. 67-5 at 2448), it can be characterized as having rolling hills throughout (Doc. 76-6 at 3184).  The Property is surrounded by already existing single-family homes which comply with the requirements of the R-1 district.  (Doc. 76-6 at 3184.)  Ultimately, the Commission recommended approving the Pulte Application.  (Doc. 76 at 2625-26.)

Unlike the Tallmadge Reserve redevelopment project, the Pulte Application faced intense public opposition.  (Doc. 76-8 at 3253.)  City Council took up the application at a March 2022 meeting.  (*Id.*)  The public hearing began with an opening statement from Pulte.  (*Id.* at 3254.)  The hearing proceeded to public comments.  (*Id.* at 3264.)  City Council heard from numerous concerned citizens who raised rezoning concerns, including traffic, home density, schooling, and the proposed redevelopment being incompatible with surrounding neighborhoods.  (*Id.* at 3264-69.)  City Council members questioned Pulte.  (*Id.* at 3286.)

During its debate, City Council considered various standards and review criteria to guide its decision.  (*Id.*)  Councilmembers cited potential concerns about the rezoning request and the planned development.  (*Id.* at 3296-3314.)  Among those concerns were: the rezoning was inconsistent with the Comprehensive Plan because residents wanted larger land and larger lots, which the rezoning of the Property in that area of Tallmadge did not support; the rezoning will not promote public health and safety due to traffic concerns in light of existing roads and

thoroughfares, and potential safety concerns regarding children going to and leaving school; some portions or all of the proposed development was incompatible with the immediate vicinity; open questions regarding adequate utility, sewer, and water facilities, due in part to an incomplete analysis of sanitary and stormwater needs; potential stormwater management issues relating to the Property's wetlands, which could be exacerbated by development; questions regarding use of the homes developed in the Property; lack of harmony with the surrounding areas; increase in noise; and usability of open space and lots, among other things.[3]  (*Id.*)  Many members expressed R-6 might make sense generally but not for the Property.  (*Id.* at 3313.)  City Council unanimously rejected the Pulte Application.  (*Id.* at 3314.)

### B.      Procedural History

Mindale Farms filed its initial complaint on March 2, 2023.  (Doc. 1.)  The complaint alleged the following claims: violation of the Equal Protection Clause (Count One); regulatory taking without just compensation (Count Two); First Amendment retaliation (Count Three); violation of the Fair Housing Act and Americans with Disabilities Act (Count Four); and declaratory judgment (Count Five).  (*Id.* at 17-22.)  Tallmadge answered on April 24, 2023. (Doc. 9.)  On July 12, 2023, Intervenors moved to intervene (Doc. 17), which the Court granted (Doc. 32).  On August 10, 2023, Tallmadge filed a motion for judgment on the pleadings under Rule 12(c).  (Doc. 21.)  The Court issued a Memorandum Opinion and Order on March 20, 2024, granting Tallmadge's motion in full.  (Doc. 37.)

On April 19, 2024, Mindale Farms moved for leave to file an amended complaint which purportedly addressed the deficiencies identified in the Court's Memorandum Opinion and

---

[3] Not all councilmembers shared in these concerns.  In fact, there was open debate amongst the councilmembers are each review criteria.  The views of councilmembers are recited here to provide context for some of the concerns raised by members.

Order.  (Doc. 38.)  The proposed amended complaint raised the following claims: (1) violation of the Equal Protection Clause (Count One); regulatory taking without just compensation (Count Two); First Amendment retaliation (Count Three); and declaratory judgment (Count Four).[4] Tallmadge opposed the motion for leave, renewing its Rule 12(c) arguments to the proposed amended complaint.  (Doc. 39.)

On February 21, 2025, the Court granted in part and denied in part Mindale Farms' motion for leave to file an amended complaint.  (Doc. 49.)  The Court found Count One, the Equal Protection claim, could proceed, but Counts Two and Three, the regulatory taking claim and First Amendment Retaliation claim, were insufficiently pleaded and futile.  (*Id.* at 1709-11.) The Court instructed Mindale Farms to file an amended complaint consistent with the Order to the extent Mindale Farms wanted to pursue its Equal Protection claim.  (*Id.* at 1711.)  Mindale Farms complied and filed its first amended complaint ("Complaint") on March 6, 2025.  (Doc. 50.)  The Complaint asserts an Equal Protection claim along with declaratory judgment.[5]  (*Id.* at 1729-30, ¶¶ 100-08.)

On August 13, 2025, Tallmadge filed a second motion for judgment on the pleadings. (Doc. 61.)  Mindale Farms responded in opposition (Doc. 62), and Tallmadge replied.  (Doc. 64).

A few weeks later, both parties moved for summary judgment.  (Docs. 67, 68.)  Mindale Farms moved for partial summary judgment, seeking judgment only on its declaratory judgment claim.  (Doc. 67.)  Tallmadge moved for summary judgment on both Mindale Farms' Equal Protection and declaratory judgment claims.  (Doc. 68.)  Intervenors joined Tallmadge's motion

---

[4] Mindale Farms did not attempt to replead the Fair Housing Act or Americans with Disability Act claims.

[5] Tallmadge moved for reconsideration of the Court's Order regarding leave to file an amended complaint.  (Doc. 54.)  The Court denied that motion.  (Non-Document Minute Order date 4/21/2025.)

for summary judgment and its opposition to Mindale Farms' motion for partial summary

judgment.  (Doc. 77.)  Both motions are fully briefed.  (Docs. 75, 76, 78, 81.)

## II.     ANALYSIS

### A.      Preliminary Matters

Prior to reaching the merits of the parties' summary judgment motions, there are related

matters to address.

**Motion to Seal/Produce**.  In support of its motion for summary judgment, Mindale

Farms filed the expert report of Debi Wilcox.  (Doc. 67-5.)  To Mindale Farms, that report

contains commercially sensitive pricing information from the real estate purchase agreement

between Mindale Farms and Pulte.  (Doc. 65 at 2265.)  Mindale Farms filed a motion to seal,

seeking permission to file a redacted version of the expert report that shields only the purchase

price and the calculations which reference the purchase price.  (Doc. 65-1.)  Tallmadge opposed

the request.  (Doc. 70.)  For the same reasons stated in this Court's previous Order regarding the

sealing of the same information (Non-Document Order dated 6/10/2024), the Motion to Seal is

granted.  The redactions are consistent with *In re Nat'l Prescription Opiate Litig.*, 927 F.3d 919

(6th Cir. 2019) and *Shane Grp., Inc. v. Blue Cross Blue Shield of Michigan*, 825 F.3d 299 (6th

Cir. 2016).  Doc. 67-5 is properly filed.

In its opposition to Mindale Farms' motion for summary judgment, so not by separate

motion, Tallmadge "moves" for an order requiring Mindale Farms to produce a fully unredacted

version of the real estate purchase agreement.  (*Id.* at 2542.)  Mindale Farms previously produced

unredacted versions of the purchase agreement, save a redacted paragraph for which it asserts

common interest privilege.  (Doc. 72 at 2557.)  This issue is not properly brought before the

Court because it was raised in an opposition and not a motion.  Fed. R. Civ. P. 7(b)(1) ("A

request for a court order must be made by motion."); *Hurt v. Allstate Indemnity Co.*, No. 24-cv-1067, 2025 WL 4302399, 2025 U.S. Dist. LEXIS 274528, at *1 n.1 (M.D. Tenn. Nov. 21, 2025) ("'it is not proper to include a separate request for relief in a response' to a motion") (quoting *Cox v. Erie Ins. Exch.*, No. 18-cv-01196, 2019 WL 3021218, 2019 U.S. Dist. LEXIS 114110, at *1 n.1 (W.D. Tenn. July 10, 2019)); *In re Chapman*, No. 24-60759, 2025 WL 1617255, 2025 U.S. Dist. LEXIS 1372, at *9 (Bankr. N.D. Ohio June 6, 2025) (collecting cases where "embedded" motions made in responses are not proper).  Because there is no pending motion, this request is denied.

**The Raber Affidavit**.  In support of its Motion for Summary Judgment, Tallmadge filed the Affidavit of Megan E. Raber (the "Affidavit").  (Doc. 68-2.)  Since 2011, Raber has been Tallmadge's Law Director.  (*Id.*)  The Affidavit presents factual information.  (*Id.*)  It also authenticates various photographs (taken in September 2025) of the Property and Tallmadge Reserve (formerly Ripley Farm).  (*Id.*)

Mindale Farms opposed the use of the Raber Affidavit and requested that the Court disregard or strike it pursuant to Rule 37 of the Federal Rules of Civil Procedure.  (Doc. 76 at 2627.)  First, Mindale Farms argued Tallmadge never identified Raber as a witness pursuant to Rule 26, and therefore, should not be allowed to provide her sworn statements.  (*Id.*)  Second, Mindale Farms argued the photographs are not relevant and are highly prejudicial.  (*Id.* at 2628.)  According to Tallmadge, Raber became a disclosable witness after Mindale Farms deposed Helen Hussing, a Tallmadge city official.  (*Id.*)  Hussing's deposition occurred after the discovery cut-off and just two weeks prior to the summary judgment deadline.  (*Id.*)

Again, the relief sought was not presented in a motion, but rather as a point of contention in Tallmadge's opposition to Mindale Farms' motion for summary judgment.  Even if it was,

Rule 26(a) requires parties to disclose any witness "that the disclosing party may use to support its claims or defenses."  Fed. R. Civ. P. 26(a)(1)(A).  If "a party fails to . . . identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion . . . unless the failure was substantially justified or is harmless."  Fed. R. Civ. P. 37(c)(1).  "[T]o assess whether a party's omitted or late disclosure is 'substantially justified' or 'harmless,'" the Sixth Circuit considers five factors:

> (1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the nondisclosing party's explanation for its failure to disclose the evidence.

*Howe v. City of Akron*, 801 F.3d 718, 748 (6th Cir. 2015) (quoting *Russell v. Absolute Collection Servs., Inc.*, 763 F.3d 385, 396-97 (4th Cir. 2014)).

There is no dispute Tallmadge's disclosure was untimely.  The remaining question is whether the late disclosure is substantially justified or harmless.  First, any surprise is minimal.  Raber has been Tallmadge's Law Director since 2011.  She has been involved in all proceedings since.  In fact, Mindale Farms pleaded it worked with Tallmadge to create the R-6 district, which would have included working with Raber.  (Doc. 50 at 1716, ¶ 18.)  All of this is reflected in public records.  Further, the substance of the Affidavit does not present any new information.  To be sure, the photographs themselves may be new, but they simply provide a snapshot of the current areas at issue, something already in the record at various points.  The remaining statements in the Affidavit have a foundation elsewhere in the record.  Accordingly, in this case, Mindale Farms can hardly maintain surprise.  *Freedom's Path at Dayton v. Dayton Metro. Housing Auth.*, 605 F. Supp. 3d 1042, 1051 (S.D. Ohio 2022) ("The extreme sanction of preclusion is simply not warranted when the importance of the additional witness was already known to the opponent.").  This is especially true where Raber "is not a mystery witness sprung

at the last minute" since Mindale Farms was "already well aware of [her] role in the relevant events."  *Id.*

Second, Tallmadge cured any surprise by disclosing Raber to Mindale Farms after learning she may be a necessary witness during a deposition that occurred after the fact discovery cutoff.  Third, the late disclosure would not disrupt any trial as one has not been scheduled.  *Howe*, 801 F.3d at 749 (late disclosure weighed against exclusion because retrial had not yet occurred).  And Tallmadge offered to make Raber available for a deposition prior to trial.

Fourth, in considering the importance of the evidence, the information provided is either undisputed (*e.g.*, the authenticity of the photographs) or is captured in other portions of the record.  While there is some relevance to the information provided, the Affidavit is not necessary for resolving the issues presented.  Fifth, Tallmadge reportedly had no plans to use Raber as a witness until after a deposition that occurred past the discovery cutoff by agreement of the parties.  While this does not make Tallmadge's disclosure timely, it provides a plausible explanation for the delay.  *Id.* ("late disclosure was more likely the result of negligence, confusion, and lack of information than underhanded gamesmanship").

On balance, the *Howe* factors weigh against disregarding or striking the Affidavit, and the Court will not do so.

**Intervenors**.  On October 30, 2025, the Intervenors filed a notice of joinder in Tallmadge's motion for summary judgment and opposition to Mindale Farms' motion for partial summary judgment.  (Doc. 77.)  The notice joins Tallmadge's motion and includes two additional comments: (1) Mindale Farms is inappropriately transforming its declaratory judgment claim into a takings claim, which the Court already dismissed; and (2) the Court should not disrupt

Tallmadge's reasonable and rational review of information provided by its constituents.  (*Id.* at 3062.)

Mindale Farms filed a response arguing the notice of joinder was procedurally and substantively deficient.  (Doc. 80 at 3628.)  Mindale Farms argued the notice is untimely and attempts to insert new arguments not raised in Tallmadge's motion.  (*Id.*)  As to the substance of the notice, Mindale Farms argued its declaratory judgment claim under Ohio common law is distinct from the now-dismissed takings claim.  (*Id.* at 3629.)  Further, Mindale Farms argued Intervenor's arguments regarding Tallmadge's action being in response to public opposition is not grounds for disparate treatment.  (*Id.* at 3629-30.)

Though the notice of joinder could have been made earlier, Mindale Farms has not cited authority requiring the Court to strike a notice of joinder for being filed thirty days after a motion for summary judgment was filed.  Moreover, Mindale Farms' assertion the Intervenors raise new and different arguments than those raised by Tallmadge is misplaced.  Tallmadge made the same arguments raised by Intervenors.  (Doc. 68 at 2492 (discussing public input and opposition to rezoning); Doc. 78 at 3604 (declaratory judgment action fails because takings claim already dismissed and no independent action is pleaded).)  And while Intervenors made two additional comments, neither materially affects the parties' submissions or the Court's analysis on summary judgment.  The Court will consider the Intervenor's notice of joinder.

**Incorporation by Reference**.  On August 13, 2025, Tallmadge filed a second motion for judgment on the pleadings.  (Doc. 61.)  That motion argued in part that City Council stated multiple objectively rational bases for denying the Application.  (*Id.* at 2046.)  Tallmadge also argued Mindale Farms' Complaint asserted City Council's reasoning for denying the Application was pretextual, but to Tallmadge, pretext cannot be considered in rational basis review.  (*Id.* at

2041.)  According to Tallmadge, the Complaint fails because it identified rational bases for denial and only argued those bases were pretextual.  (*Id.*)

Tallmadge then filed its motion for summary judgment on September 30, 2025.  (Doc. 68.)  In part, Tallmadge argued it is entitled to summary judgment for the same reasons articulated in its second motion for judgment on the pleadings.  (*Id.* at 2496.)  Specifically, in the section of Tallmadge's motion for summary judgment addressing rational basis, Tallmadge stated:

> For the reasons set forth in the City's Second Motion for Judgment on the Pleadings and Reply in Support of that Motion, which are again incorporated by reference as if fully rewritten herein, Plaintiff cannot meet its heavy burden in this regard. Plaintiff cannot negate all conceivable bases for the City's actions denying Pulte's Application and repealing the R-6 zoning classification and Plaintiff's allegation of pretext is irrelevant.

(*Id.*)  In this way, Tallmadge incorporated its arguments made in the second motion for judgment on the pleadings into its motion for summary judgment.

Mindale Farms objected to this incorporation by reference.  (Doc. 76 at 2633-34.) Mindale Farms argued the incorporation is procedurally improper, unnecessarily complicates the record, and violates the Court's page limits.  (*Id.*)  Tallmadge asserted the incorporation by reference was to ease the burden on the Court since the specific issue—whether there was a rational basis to deny the rezoning—will have been briefed on multiple occasions for the Court. (Doc. 78 at 3611.)

Tallmadge's motion for summary judgment is 14 pages.  Under the Court's 20-page limitation for motions for summary judgment, Tallmadge could have included six additional pages.  Having counted the pages and portions of pages dedicated to its incorporated arguments, Tallmadge has not offended the 20-page limit.  Additionally, the specific issue has been briefed before.  Mindale Farms opposed the second motion for judgment on the pleadings.  Mindale

Farms also opposed Tallmadge's motion for summary judgment on the same issue.  With no surprise and with ample opportunity to address the arguments, whether under Rule 12(c) or Rule 56, Mindale Farms has not shown prejudice in considering Tallmadge's rational basis arguments now.

### B.  Summary Judgment Legal Standard

"A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought."  Fed. R. Civ. P. 56(a). "Summary judgment is appropriate only if the pleadings, depositions, answers to interrogatories, and affidavits show there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  The moving party bears the burden of showing that no genuine issues of material fact exist." *Williams v. Maurer*, 9 F.4th 416, 430 (6th Cir. 2021) (citations and quotations omitted).  A "material" fact is one that "might affect the outcome of the suit under the governing law[.]" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).  "[A] genuine dispute of material fact exists if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Abu-Joudeh v. Schneider*, 954 F.3d 842, 849-50 (6th Cir. 2020) (citations and quotations omitted).

"Once the moving party satisfies its burden, the burden shifts to the nonmoving party to set forth specific facts showing a triable issue of material fact." *Queen v. City of Bowling Green, Ky.*, 956 F.3d 893, 898 (6th Cir. 2020) (quotation and citations omitted).  On summary judgment, the inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. *Kalamazoo Acquisitions, L.L.C. v. Westfield Ins. Co.*, 395 F.3d 338, 342 (6th Cir. 2005).  A party asserting or disputing a fact must cite evidence in the record or show the record establishes either the absence or the presence of a genuine dispute. *See* Fed. R.

Civ. P. 56(c) & (e).  Rule 56 further provides "[t]he court need consider only" the materials cited in the parties' briefs.  Fed. R. Civ. P. 56(c)(2); *see also Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989) ("The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.").

"Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986) (quotation and citation omitted).  The Court's role is not to make credibility determinations or "weigh" conflicting evidence.  *Payne v. Novartis Pharms. Corp.*, 767 F.3d 526, 530 (6th Cir. 2014).  "The ultimate question is whether the evidence presents a sufficient factual disagreement to require submission of the case to the jury, or whether the evidence is so one-sided that the moving parties should prevail as a matter of law."  *Id.*  "This standard of review does not differ when reviewing cross-motions for summary judgment versus a motion filed by only one party."  *Hamilton Cnty. Educ. Ass'n v. Hamilton Cnty. Bd. of Educ.*, 822 F.3d 831, 835 (6th Cir. 2016) (citing *U.S. SEC v. Sierra Brokerage Servs., Inc.*, 712 F.3d 321, 327 (6th Cir. 2013)).

### C.     Tallmadge's Motion for Summary Judgment

Mindale Farms asserted its Equal Protection Clause claim under a class-of-one theory. (Doc. 50 at 1730, ¶ 100.)  Tallmadge moved for summary judgment on this claim.  (Doc. 68.) Mindale Farms did not move for summary judgment on this claim, but did oppose Tallmadge's motion.  (Doc. 76.)

The Equal Protection Clause states "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, § 1.  "The clause is 'essentially a direction that all persons similarly situated should be treated alike.'"  *EJS Props.,*

*LLC v. City of Toledo*, 698 F.3d 845, 864 (6th Cir. 2012) (quoting *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439, 105 S. Ct. 3249, 87 L. Ed. 2d 313 (1985)).  "A 'class of one' may bring an equal protection claim, 'where the plaintiff alleges that the state treated the plaintiff differently from others similarly situated and that there is no rational basis for such difference in treatment.'"  *Id.* (quoting *Warren v. City of Athens*, 411 F.3d 697, 710 (6th Cir. 2005)).  Thus, a plaintiff asserting a class-of-one equal protection claim must show two elements: (1) that the government "treated the plaintiff differently from others similarly situated," and (2) that "there is no rational basis for such difference in treatment."  *Andrews v. City of Mentor*, 11 F.4th 462, 473 (6th Cir. 2021) (quoting *Warren*, 411 F.3d at 710).

### 1.      **Similarly Situated**

"The first element of a class of one equal-protection claim is that the two applicants who were treated differently were 'similarly situated in all relevant respects.'"  *EJS Props.*, 698 F.3d at 865 (quoting *TriHealth, Inc. v. Bd. of Comm'rs*, 430 F.3d 783, 790 (6th Cir. 2005)).  "When evaluating whether parties are similarly situated, courts should not demand exact correlation, but should instead seek relevant similarity."  *Andrews*, 11 F.4th at 574 (quoting *EJS Props.*, 698 F.3d at 864-65).  "Inevitably, the degree to which others are viewed as similarly situated depends substantially on the facts and context of the case."  *Losel v. City of Frankenmuth*, 692 F.3d 452, 463 (6th Cir. 2012) (quoting *Jennings v. City of Stillwater*, 383 F.3d 1199, 1210-11 (10th Cir. 2004)).  In the zoning context, the focus "should be framed in terms of the properties and their owners."  *Id.*  The relevant question is: "[d]oes the evidence create a genuine dispute as to whether [Tallmadge], in denying [Mindale Farms' rezoning application], intentionally treated [Mindale Farms] differently from others similarly situated."  *Green Genie, Inc. v. City of Detroit*, 63 F.4th 521, 527 (6th Cir. 2023) (citation and quotations omitted).

Tallmadge argues the Property is not similarly situated to Ripley Farm as a matter of law. (Doc. 68 at 2491.)  Tallmadge cites various differences between the two.  First, the Pulte Application was five years after the Ripley Farm application.  (*Id.*)  To Tallmadge, its experience with the Ripley Farm project informed it and its constituents of the effects of a development similar to Ripley Farm.  (*Id.* at 2492-93.)  Tallmadge thus changed its policy with respect to R-6 districts.  (*Id.*)  Second, the Pulte Application differed from the Ripley Farm application in the volume of land adjacent to environmentally sensitive areas, land adjacent to existing communities, location within Tallmadge's city limits, and existing character of the surrounding areas.  (*Id.* at 2493-95.)  Specifically, Tallmadge points to the location of wetlands and environmentally sensitive areas within the properties, the already existing subdivisions neighboring the properties, and the existence of commercially developed properties next to Ripley Farm.  (*Id.*)

Not surprisingly, Mindale Farms argues the Property is similarly situated to Ripley Farm. (Doc. 76 at 2629-30.)  Mindale Farms first argues Tallmadge's timing argument does not apply here because there was no change to the Comprehensive Plan and Tallmadge did not adopt any new policies between the Ripley Farm application and the Pulte Application.  (*Id.* at 2630.) Mindale Farms then focuses on similar parcel sizes, that both were previously used for farming, and that both are in the Comprehensive Plan's Focus Area 5.  (*Id.*)  To Mindale Farms, both are residential projects and therefore similar in nature and character.  (*Id.*)  Mindale Farms also rebuts Tallmadge's position and argues the properties are similar in location and surrounding area, geography and topography, and location to environmental features and utilities.  (*Id.* at 2631-32.)

"Gaps in time and context may suggest a change in policy rather than differential treatment." *EJS Props.*, 698 F.3d at 866.  A formal change to a city's processes is not required. "New priorities" can render a later land use application sufficiently dissimilar.  *Taylor Acquisitions LLC v. City of Taylor*, 313 F. App'x 826, 837 (6th Cir. 2009) (discussing how a city's "new priorities" meant applications were not similarly situated where separated by time). The parties dispute whether such a formal change occurred, with Tallmadge saying it did and Mindale Farms claiming just the opposite.  While the parties do not dispute Tallmadge made no formal, written change to the Comprehensive Plan, focusing only on that point misses the larger one—that being whether Tallmadge shifted its priorities in the years between Ripley Farm's and Mindale Farms' rezoning applications.

In *Andrews*, the Sixth Circuit found judgment as a matter of law inappropriate where nothing "suggest[ed] that the relevant policies changed between 2017 and 2019," and instead, revealed the city maintained the same comprehensive plan.  *Andrews*, 11 F.4th at 474.  In contrast, the city did not come forward with any policy change.  *Id.*  Here, Tallmadge points to a policy change, albeit not one that resulted in a modification of the Comprehensive Plan or zoning laws (at that time).  After Tallmadge approved the Ripley Farm rezoning, citizens voiced increased concerns about a variety of issues, namely, traffic, home density, schooling, and the proposed redevelopment being incompatible with surrounding neighborhoods.  (Doc. 68 at 2487.)  Councilmembers voiced those same concerns at meetings.  (Doc. 61-2.)  "New priorities" can render a later land use application "not similarly situated."  That citizens and councilmembers objected to Mindale Farms' plans based on their Ripley Farm observations and experiences is undisputed.  (*Id.*)  Similarly undisputed is that City Council considered these objections when it denied Mindale Farms' rezoning application.  (*Id.*)  Thus, in the five years

between Ripley Farm and Mindale Farms' rezoning application, Tallmadge and its citizens learned much about large-scale residential developments.

The location of the properties is also relevant to the "similarly situated" analysis.  Ripley Farm was located on the far eastern edge of Tallmadge, with its eastern side abutted by commercially developed properties.  The Property is not adjacent to any commercial development.  The Property would be surrounded by already existing R-1 zoned residential subdivisions.  The Comprehensive Plan on which Mindale Farms heavily relies states one of the overarching principles is to "[p]reserve and enhance the City's quality and character, such as . . . buffering between contrasting land uses."  (Doc. 76-4 at 2862.)  It goes on to state the "application of new zoning standards, such as permitted in the Residential R-6 district, could provide the flexibility in site design and the arrangement of the dwellings away from adjacent contrasting uses."  (*Id.*)  In short, the Comprehensive Plan recognized an R-6 district could be placed in a transitional area next to commercial (or other) land uses.  For Ripley Farm, this makes sense.  It is abutted by commercial development.  But the Property, if developed as an R-6 district, would not serve that same purpose.  This is not to say a R-6 district can only be used as a transitional or buffering project.  But the Property being surrounded entirely by other residentially zoned properties is a notable difference between the properties.

Again, *Andrews* is instructive.  In *Andrews*, the plaintiff argued another development project, known as the Woodlands, was similarly situated.  The plaintiff alleged their land and the Woodlands land were similarly situated because the location of the properties was similar, including the character of the surrounding neighborhoods.  *Andrews*, 11 F.4th at 474-75.  The Sixth Circuit found the allegation sufficient to withstand a motion for judgment on the pleadings. *Id.* at 475.  "[T]hese sorts of considerations—location and the character of the neighborhood—

are relevant to the City's determination of whether to grant or deny a request for rezoning." *Id.* at 475.  Notable is the Sixth Circuit's comments about comparisons between the two properties at the judgment on the pleadings stage:

> The City will have ample opportunity to develop a factual record regarding the two properties (and the others that the Trust has identified) that elaborates on these and other potentially material differences between them; if it does, nothing forecloses the City from raising similar arguments at a later stage of the case, such as summary judgment, that allows for a more fulsome comparison.

*Id.*

This case, now on summary judgment, allows for a "more fulsome comparison."  *Id.* And the locations are materially different.  So too is the character and nature of the surrounding area.  The surrounding area, consisting of R-1 zoned residential homes, is materially different than the nature of the surrounding area for Ripley Farm which abuts a commercial development.

Less clarity is offered for the assessment of each property's character.  There is conflicting information in the record relating to whether the geography and topography are similar, such as whether the Property is generally flat or has rolling hills, which would distinguish it from the Ripley Farm property which was mostly flat.  And the parties dispute whether the existing infrastructure and wetlands materially differentiate the two properties.  But for the reasons above, the dispute does not create a genuine issue of a material fact precluding judgment as a matter of law.  The distinctions above are sufficient to negate Mindale Farms' assertion that the Property is similarly situated to Ripley Farm.  Because the disparate treatment was justified by the properties' differences, the Equal Protection claim fails.

### 2. Rational Basis

Even if the properties were similarly situated, the claim fails at the rational basis analysis. A plaintiff raising a class-of-one claim bears a particularly "heavy burden" to show no rational

basis for different treatment.  *Shavers v. Almont Twp.*, 832 F. App'x 933, 937-38 (6th Cir. 2020) (quoting *Loesel*, 692 F.3d at 461-62).  In this circuit, "[c]ourts generally view class-of-one claims with skepticism given the potential to provide a federal cause of action for review of almost every executive and administrative decision made by state actors."  *Id.* (quotation and citation omitted).

"Under rational basis review, the defendant has no obligation to produce evidence to sustain the rationality of its actions; its choice is presumptively valid and may be based on rational speculation unsupported by evidence or empirical data.'"  *Loesel*, 692 F.3d at 465.  A plaintiff must show the decision at issue "is so unrelated to the achievement of any combination of legitimate purposes that the court can only conclude that the [government's] actions were irrational."  *Ziss Bros. Const. Co., Inc. v. City of Independence*, 439 F. App'x 467, 478 (6th Cir. 2011) (quoting *Warren*, 411 F.3d at 710).  A party can meet this burden by either (a) "negat[ing] every conceivable basis which might support the government action," or (b) "demonstrating that the challenged government action was motivated by animus or ill-will."  *Warren*, 411 F.3d at 711 (citation omitted).  Mindale Farms does not plead animus or ill-will, and so, its Equal Protection claim can only proceed if it negates every conceivable basis which might support Tallmadge's action.

Framing of the zoning dispute before the Court is important.  Mindale Farms brought constitutional claims arguing violations of the Fourteenth Amendment.  A federal court's role is to view Tallmadge's action through a constitutional lens and determine if it has articulated a rational basis for any purported disparate treatment.  Crucially, "despite the temptation it is not the province of a federal court to act as a super-zoning board."  *Schenck v. City of Hudson*, 114 F.3d 590, 594 (6th Cir. 1997) (citing *Exxon Corp. v. Governor of Maryland*, 437 U.S. 117, 124,

98 S. Ct. 2207, 57 L. Ed. 2d 91 (1978) ("[T]he Due Process Clause does not empower the judiciary to sit as a superlegislature to weigh the wisdom of legislation."). The rational basis standard of review is "a paradigm of judicial restraint, growing out of recognition that equal protection is not a license for courts to judge the wisdom, fairness or logic of legislative choices." *TriHealth*, 430 F.3d at 791. That is to say, this Court's review is not a merits determination on whether Tallmadge was correct. *Id.* (holding that though plaintiff "cites several reasons to question the wisdom and fairness of the Board's decision," "the wisdom, fairness and logic of the Board's choice are all matters beyond the purview of [the court's] scrutiny."). "On rational basis review, it is not the Court's role to evaluate the competing interests of property owners, neighbors, and the larger community to find the best, most narrowly-tailored compromise." *Pratt Land & Development, LLC v. City of Chattanooga*, 581 F. Supp. 3d 962, 984 (E.D. Tenn. 2022). Instead, that is "the quintessential role of the legislative body." *Id.*

With these principles in mind, the Court turns to Tallmadge's articulated rationale bases.

### a. Traffic Concerns

During the meeting on the Application, councilmembers expressed various concerns about traffic safety. Councilmembers discussed already existing poor traffic conditions in the area. (Doc. 61-2 at 2099.) They expressed concerns about a dangerous blind hill and the effect of increased traffic on that hill. (*Id.*) They spoke of concerns about increased cut-through traffic. (*Id.*) Councilmembers expressed concerns that the development might cause further traffic issues in the area, which Tallmadge would have to address at a substantial cost later down the road. (*Id.*) One councilmember noted a trail near the Property is frequented by children, and a densely populated neighborhood near that trail might be dangerous. (*Id.*) That same

councilmember noted that a separate road would become a connector for traffic, but the councilmember thought that road could not, or should not, but used in that capacity.  (*Id.*)

Mindale Farms does not argue these traffic concerns could be a legitimate rational basis in a general sense.  Instead, Mindale Farms argues these concerns are not legitimate rational basis here.  In support, Mindale Farm cites to traffic studies where two engineering firms found the development of the property as an R-6 district would not negatively affect traffic.  (Doc. 76 at 2634-38.)  Mindale Farms also argues that, as currently designated, the Property could see an increase in traffic as an R-1 district as compared to an R-6 district.[6]  (*Id.*)  Thus, to Mindale Farms, it has negated Tallmadge's concerns regarding traffic, and any denial of the rezoning application on this basis was irrational.  (*Id.*)  But the traffic studies do not render Tallmadge's concerns irrational.  Councilmembers reviewed the study, and their concerns were not fully resolved.  (Doc. 61-1 at 2099-2100.)  They pointed to assumptions in the studies they disagreed with, along with remaining open questions (*id.* at 2091), in addition to citing public safety concerns outside of the increase in traffic itself (*id.* at 2099).

Even if the councilmembers' concerns were not entirely accurate, courts have consistently recognized city decisions "may be based on rational speculation unsupported by evidence or empirical data."  *EJS*, 698 F.3d at 865 n.16 (quoting *TriHealth*, 430 F.3d at 790).  In

---

[6] Mindale Farms repeats this argument throughout its briefing.  To Mindale Farms, because under the current R-1 designation more homes could technically be built, most of Tallmadge's stated concerns cannot be rational.  This is unpersuasive.  In other filings, Mindale Farms has admitted it could not economically or practically develop homes under the R-1 designation "[a]fter accounting for easements, wetlands, streams, and slopes," because "the [Property] would yield too few scattered lots to spread the fixed costs of necessary infrastructure."  (Doc. 67 at 2297.)  Thus, it does not appear Mindale Farms could actually exceed the number of homes it proposes under R-6.  In fact, during the March 2022 City Council meeting, a Pulte representative revised the R-1 development down to 186 homes, much less than the proposed 236 homes under R-6.  (Doc. 61-2 at 2060.)

short, Mindale Farms has not shown Tallmadge's concerns regarding traffic were wholly irrational. *Braun v. Ann Arbor Charter Twp.*, 519 F.3d 564, 574 (6th Cir. 2008) ("safety concerns such as higher traffic flow" . . . "clearly defeat any argument that the decision had 'no rational relationship to any public purpose'") (quoting *Warren*, 411 F.3d at 705); *Schenck*, 114 F.3d at 594 (collecting cases where goals of reducing traffic, congestion, and noise are legitimate state interests).

### b.      Compatibility and Harmony

Tallmadge points to compatibility and harmony with the surrounding area as another basis on which it denied the Application.  To be sure, councilmembers presented differing opinions on this issue.  (Doc. 61-2 at 2106.)  Tallmadge argues the aesthetics of an R-6 district, along with the small lot sizes, create visual incompatibility with the surrounding areas.  (Doc. 61 at 2036.)

Mindale Farms asserts Tallmadge's compatibility and harmony concerns are not rational.  (Doc. 76 at 2636.)  Again, Mindale Farms does not dispute these reasons could be a rational basis in the appropriate case.  Indeed, aesthetic concerns are a rational basis for government action. *See Shoemaker v. City of Howell*, 795 F.3d 553, 567 (6th Cir. 2015); *Oliver v. Etna Twp.*, 731 F. Supp. 3d 901, 920 (S.D. Ohio 2024) (finding "'minimizing urban development,' 'promoting ruralness,' and preserving 'a rural, quiet way of life for Township residents removed from urbanization'" as legitimate government interests).  Instead, it argues the concerns are simply unwarranted here.

Tallmadge has articulated its intention to maintain large lots for residential developments. This is, in part, to ensure new developments remain similar to already developed surrounding neighborhoods.  And it furthers the desire to keep this particular area of Tallmadge more rural in

character.  Because these reasons are legitimate and rationally related to zoning laws, Mindale

Farms' assertion that such concerns are irrational here is without merit.

### c.        Public opposition

Tallmadge asserts vehement public opposition to the project as a rational basis to deny

the rezoning application.  (Doc. 78 at 3607.)  There is no dispute there was significant public

opposition to the development project.  However, Mindale Farms argues public opposition

cannot be the basis for the denial of the rezoning application.  Mindale Farms is mistaken.  In

*Sowers v. Powhatan Cnty.*, 347 F. App'x 898 (4th Cir. 2009), the Fourth Circuit held that

vehement public opposition was a sufficient basis to render the county's decision not only

rational but also a reason to find the two rezoning applications not similarly situated.  *Id.* at 901

("the record still indisputably demonstrates that the public opposition to [the] application was so

fervent as to render him differently situated" from the prior application).  As it relates to rational

basis, the court held:

> Contrary to [plaintiff's] contention, public opposition does furnish a rational basis
> for differential treatment in zoning decisions. Indeed, the very purpose of the
> deferential rational basis inquiry is to respect the democratic process, albeit with an
> eye to whether purely odious classifications are at work. [. . .] The public's
> opposition to [plaintiff's] zoning application did not stem from naked animosity or
> baseless fear, but from genuine concerns over traffic, safety, and the loss of rural
> surroundings.   [Plaintiff's]  was  not  a  case  of  mere  negative  attitudes  . . .
> unsubstantiated by factors which are properly cognizable in a zoning proceeding.

*Id.* at 903-04; *see also Harlen Assoc. v. Incorporated Vill. of Mineola*, 273 F.3d 494, 500 (2d Cir.

2001) ("[e]ven if the Board's action were based solely on community opposition, such action

would not be unconstitutionally arbitrary if the opposition is based on legitimate state interests

such as, *inter alia,* traffic, safety, crime, community pride, or noise.").  The Fourth Circuit's

reasoning is persuasive.

Here, there is no evidence the public's opposition was based on "naked animosity or baseless fear," or any other concern that is not cognizable in a zoning dispute.  Responding to public opposition, in combination with the above concerns, is another rational basis for denying the Application.

### d.        Wetlands, Stormwater, Environment, and Open Spaces

Tallmadge asserts the decision to deny the Application is further supported by concerns regarding wetlands, stormwater, preservation of the environment, and a desire for more open spaces.  (Doc. 61 at 2046.)  For instance, at the City Council meeting, councilmembers expressed concerns about the effect of high-density housing and possible flooding.  (Doc. 61-2 at 2101-02.)  Councilmembers also identified potential environmental concerns relating to the Property's soil composition because the Property had been, and still was, used as a working farm that treated the soil with fertilizers.  (*Id.* at 2109.)  As it relates to open space, councilmembers noted the Property's proposed development would only leave unusable land open.  (*Id.* at 2109.)  And councilmembers found there were still "a lot of questions" regarding utility, sewer, and water facilities.  (*Id.* at 2101.)

Mindale Farms asserts these concerns are unfounded.  (Doc. 76 at 2636-37.)  In Tallmadge's initial review, no issues were found as it relates to wetlands, and the proposed development would better protect wetlands than a development under R-1.  (*Id.* at 2636.)  No stormwater issues were reported in Tallmadge's review.  (*Id.*)  However, like Mindale Farms' arguments about traffic concerns, Tallmadge's previous studies and Mindale Farms' experts do not render Tallmadge's reasons entirely irrational.

The concerns about stormwater, sewers, wetlands, and open space have some support in the record, namely unanswered questions about stormwater and sewer capacities, that most open

space would be wetlands or ponds, and potential increased future costs.  (Doc. 61-2 at 2101-02.)  It therefore passes the rational basis test.  *Taylor Acquisitions*, 313 F. App'x at 837 (holding that the preservation of "green space and wooded land owned by the City" were "clearly reasonable and appropriate objectives for any city council and mayor to have").

### 3.     Pretext

Mindale Farms asserts each of the asserted reasons Tallmadge offers are mere pretexts for denying the Application.[7]  (Doc. 76 at 2634.)  Whether courts can evaluate if proffered reasons were the "real" reasons, or are mere pretext, has been debated among circuit and district courts.  *See XP Vehicles, Inc. v. Dep't of Energy*, 118 F. Supp. 3d 38, 76-77 (D.D.C. 2015) (collecting cases discussing whether pretext allegations alone are sufficient to undermine an otherwise rational basis for government conduct in the context of a class of one equal protection claim); *Pratt Land & Development*, 581 F.Supp.3d 962, 984 (E.D. Tenn. 2022) ("[T]he true purpose of the policy, (*i.e.*, the actual purpose that may have motivated its proponents, assuming this can be known) is irrelevant for rational basis analysis.").

The Court need not weigh in on this debate.  Tallmadge has presented evidence supporting each of its reasons for denying the Application.  The proffered reasons for denying the Application are, in fact, rational reasons.

---

[7] Mindale Farm also faults Tallmadge for "shifting justifications" and its kitchen sink approach to denying the Application.  But nothing in the record supports this contention.  The same concerns expressed by councilmembers are presented in Tallmadge's briefing.  Even if not, the conceivable bases do not need to be articulated at the time of the decision.  *See Bd. of Trs. of Univ. of Alabama v. Garret*, 531 U.S. 356, 367, 121 S. Ct. 955, 148 L. Ed. 2d 866 (2001) ("the State need not articulate its reasoning at the moment a particular decision is made. Rather, the burden is upon the challenging party to negative any reasonably conceivable state of facts that could provide a rational basis for the classification.").

### 4.      Conclusion

In summary, the undisputed facts demonstrate that Mindale Farms has not identified a similarly situated comparator.  Ripley Farm is not similarly situated to Mindale Farms.  Further, nothing in the record suggests Tallmadge's action "[wa]s so unrelated to the achievement of any combination of legitimate purposes that . . . that the [City's] actions were irrational." *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 84, 120 S. Ct. 631, 145 L. Ed. 2d 522 (2000).  Instead, the City Council meeting minutes reflect a reasoned debate regarding a local city's land use.  Tallmadge's denial of the Application did not violate the Constitution.  *Pratt Land & Development*, 581 F. Supp. 3d at 984 (city council "listen to their constituents, they test the wind; they try to please as many people as possible, consistent with the constitution and good conscience.  And they are not to be condemned for doing so.  That is their job.").

There is no genuine dispute of any material fact.  Tallmadge is entitled to judgment in its favor on the Equal Protection claim.

### D.      Declaratory Judgment[8]

Count Two of the Complaint seeks declaratory judgment.  (Doc. 50 at 1730-31, ¶ 108-13.)  Mindale Farms alleges the R-1 zoning designation as applied to the Property is unconstitutional under Ohio law.  (*Id.* at 1730, ¶ 109.)  As such, Mindale Farms seeks two declarations from this Court: (1) a declaration the R-1 zoning district is unconstitutional as applied to the Property; and (2) a declaration rezoning the Property to the R-6 district and approving the Pulte Application.  (*Id.* at 1730-31, ¶¶ 111-12.)  Mindale Farms moves for partial summary judgment on this claim.  (Doc. 67.)  Tallmadge also moves for summary judgment on this claim.  (Doc. 68.)

---

[8] This is the only claim on which Mindale Farms moved for summary judgment.

As a threshold issue, the parties dispute the characterization of Mindale Farms' declaratory judgment claim.  To Mindale Farms, the claim is a separate and distinct claim arising under Ohio law.  (Doc. 67 at 2294.)  As Mindale Farms explains, in Ohio, a property owner may judicially challenge its current zoning and rezone its property through a declaratory judgment action.  (*Id.* (citing *Union Oil Co. v. Worthington*, 405 N.E.2d 277, 280 (Ohio 1980).)  Tallmadge sees the claim differently.  To Tallmadge, the declaratory judgment claim is derivative of the Equal Protection claim in the Complaint.  (Doc. 75 at 2598.)  Because Tallmadge argues it is entitled to summary judgment on the Equal Protection claim, the declaratory judgment action must also fail.  (*Id.*)

In Ohio, a property owner can judicially challenge a zoning regulation.  *Union Oil*, 405 N.E.2d at 280.  Mindale Farms' claim is not the same as its takings claim.  Instead, it presents a distinct claim arising under state law.  *See Goldberg Cos. v. Richmond Heights City Council*, 690 N.E.2d 510, 512 (Ohio 1998) (to prevail, the property owner must demonstrate the ordinance's unconstitutionality "beyond fair debate.").

The parties brief another threshold issue, that being whether the Court *should* entertain the state law claim.  (Doc. 75 at 2605.)  Again, the parties dispute the proper legal framework to present this question.  What is clear is that Mindale Farms asserted its state law claim and asserted supplemental jurisdiction under 28 U.S.C. § 1367.  (*See* Doc. 50 at 1715, ¶ 13 (complaint pleading "Jurisdiction supporting Mindale Farms' supplemental Ohio Constitutional claims is conferred by 28 U.S.C. § 1367); Doc. 81 at 3636.)

Section 1367 provides that "in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same

case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a).

However, a district court may decline supplemental jurisdiction if:

(1) the claim raises a novel or complex issue of State law,

(2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,

(3) the district court has dismissed all claims over which it has original jurisdiction, or

(4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c)(1)-(4).  Relevant here is § 1367(c)(3).  Before declining jurisdiction, a "district court should consider the interests of judicial economy and the avoidance of multiplicity of litigation and balance those interests against needlessly deciding state law issues." *Landefeld v. Marion Gen. Hosp., Inc.*, 994 F.2d 1178, 1182 (6th Cir. 1993) (citing *Aschinger v. Columbus Showcase Co.*, 934 F.2d 1402, 1412 (6th Cir. 1991)).  "When all federal claims are dismissed before trial, the balance of considerations usually will point to dismissing the state law claims." *Stanley v. W. Mich. Univ.*, 105 F.4th 856, 867 (6th Cir. 2024).[9]  Indeed, district courts have "broad discretion" to exercise supplemental jurisdiction even when § 1367(c) applies if the

---

[9] In a recent published opinion, the Sixth Circuit addressed the exercise of supplemental jurisdiction when § 1367(c) applies. *See Williams v. Addison Cmty. Schs.*, No. 25-1205, 2026 WL 575854, 2026 U.S. App. LEXIS 6032 (6th Cir. Mar. 2, 2026).  There, it reversed the district court's exercise of supplemental jurisdiction because Michigan state courts had not yet spoken to whether a private cause of action exists for claims pursued under the Fair and Just Treatment clause of Michigan's constitution. *Id.* at *10.  For this reason, comity mandated dismissal of the state law claim without prejudice.  Notably, the opinion cautioned that "district courts should not read this opinion to restrict the broad exercise of supplemental jurisdiction . . . ." *Id.* at *12.  The unique circumstances presented in *Williams* do not appear here.  This is a "run-of-mine" Equal Protection claim arising from a land use dispute.  There is nothing novel or complex about the facts here that would require the declination of supplemental jurisdiction in favor of Ohio court's resolving the declaratory judgment relief Mindale Farms seeks.

interests of "judicial economy, convenience, fairness, and comity" support doing so.  *Williams*,

2026 WL 575854, 2026 U.S. App. LEXIS 6032, at *6.

All of these interests favor exercising supplemental jurisdiction.  The parties have

litigated this case for nearly three years.  The facts presented at summary judgment are largely

undisputed.  And the Court has determined that Tallmadge's denial of the Application did not

offend constitutional principles, namely the Fourteenth Amendment.  Denying supplemental

jurisdiction to allow further state court litigation on the same issues with the same facts

needlessly extends litigation, burdens Ohio courts, and delays finality on a legal determination

that is resolved here.

Turning now to the merits of Mindale Farms' claim.  In Ohio, a property owner can

judicially challenge a zoning regulation.  *Union Oil*, 405 N.E.2d at 280.  "To prevail, the

property owner must demonstrate the ordinance's unconstitutionality 'beyond fair debate.'"

*Lifestyle Cmtys., Ltd. v. Worthington*, No. 25-3048, 2026 WL 206210, 2026 U.S. App. LEXIS

1995, *18-19 (6th Cir. Jan. 27, 2026) (quoting *Goldberg*, 690 at 512).  "This means that the

ordinance must deny the owner 'the economically viable use of their land without substantially

advancing a legitimate government interest.'"  *Id.* (quoting *Karches v. Cincinnati*, 526 N.E.2d

1350, 1357 (Ohio 1988)).  Success is difficult: "[z]oning ordinances are presumed

constitutional."  *Goldberg*, 690 N.Ed.2d at 511.  A party must rebut this presumption by showing

the zoning is "clearly arbitrary and unreasonable" with no "substantial relation to public health,

safety, morals, or general welfare of the community."  *Lifestyle Cmtys.*, 2026 WL 206210, 2026

U.S. App. LEXIS 1995, at *19.

The declaratory judgment action fails because Mindale Farms has not shown the R-1

zoning designation does not "substantially advance[e] a legitimate government interest."  As

explained above, Tallmadge articulated various legitimate government interests which substantially relate to public health, safety, or the general welfare of the community. Accordingly, irrespective of whether the zoning makes the Property economically worse off, the claim cannot proceed. *Ketchel v. Bainbridge Twp.*, 557 N.E.2d 779, 785 (Ohio 1990) (affirming dismissal of declaratory judgment claim relating to minimum lot size restriction because "[w]hile the record here contains some evidence that appellants would be unable to economically use their property for [high-density] single-home development," the record also shows the city has a legitimate government interest and property owners "have not shown beyond fair debate that the minimum lot size requirement is unconstitutional, unreasonable and not substantially related to the public health or safety").  Put more simply, because Tallmadge has articulated rational bases for its actions, Mindale Farms has not shown the current zoning designation deprives it of economically viable use of the Property "without substantially advancing a legitimate government interest." *Lifestyle Cmtys.*, 2026 WL 206210, 2026 U.S. App. LEXIS 1995, at *18-19.

In Mindale Farms' view, the R-6 designation better aligns with the public health, safety, morals, and welfare goals of the City.  (Doc. 67 at 2304.)  But that is not the legal standard.  "The zoning ordinance is the focal point of the analysis, not the property owner's proposed use, and the analysis begins with a presumption that the ordinance is constitutional." *Jaylin Invests., Inc. v. Moreland Hill*, 839 N.Ed.2d 903, 908 (Ohio 2006).  That is, "[t]he analysis focuses on the legislative judgment underlying the enactment, as it is applied to the particular property, not the municipality's failure to approve what the owner suggests may be a better use of the property." *Id.*  To hold otherwise would be to "eliminate the initial presumption that the zoning is constitutional" and would allow parties to "argue over who presents the better use of the

property."  *Id.*  "But whether proposed zoning might better advance the stated governmental interest does not address the issue of whether the zoning ordinance at issue advances a legitimate government interest."  *Id.* at 909 (citation omitted).

Tallmadge has asserted several rational government interests for the R-1 zoning district. Mindale Farms has not carried its burden, and the claim fails as a matter of law.

## III.    CONCLUSION

For the reasons stated above, Plaintiff Mindale Farms Co.'s Motion for Partial Summary Judgment (Doc. 67) is DENIED.  Defendant City of Tallmadge's Motion for Summary Judgment (Doc. 68) is GRANTED.  Defendant City of Tallmadge's Second Motion for Judgment on the Pleadings (Doc. 61) is DENIED as moot.  Plaintiff Mindale Farms Co.'s Motion for Leave to Seal (Doc. 65) is GRANTED.

**IT IS SO ORDERED.**

Date:   March 20, 2026

BRIDGET MEEHAN BRENNAN
UNITED STATES DISTRICT JUDGE